**BLUE BELL, INC., Plaintiff,**

v.

**WESTERN GLOVE WORKS LTD., Defendant.**

No. 92 Civ. 2277 (RWS).

United States District Court, S.D. New York.

March 22, 1993.

Pennie & Edmonds, New York City (David Weild, III, James W. Dabney, Robert S. Broder, of counsel), for plaintiff.

Arnold & Porter, New York City (Thomas J. McGrew, Cary H. Sherman, Michael D. Schissel, Amy R. Filvaroff, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Plaintiff Blue Bell, Inc. ("Blue Bell") has moved for an order vacating that part of an arbitral award, dated September 30, 1992, (the "Award") against its licensee Western Glove Works Ltd. ("Western Glove") which did not permit it to terminate its license agreement with Western Glove. Western Glove has responded in part with a cross motion to confirm the Award. For the reasons set forth below the cross-motion to confirm is granted and the motion to vacate is denied.

### The Facts

Blue Bell, Inc. is a division of VF Corporation, a Delaware corporation which manufacturers and licenses Wrangler® and Lee® jeans among other products. One of its most successful jeanswear products is the Wrangler Prorodeo model, which it has distinguished from the competition by trademark and distinctive trade dress since 1955. Trademarks used to sell the Prorodeo include an image of a cowboy roping calf (the "Cowboy Mark"), a brown patch sewn onto the right rear pocket of each garment (the "Wrangler® patch"), and a bright yellow tradedress label, showing the Cowboy Mark, which is inserted into the rear pocket at the point of sale and serves to identify each garment to a potential customer in the store (the "pocket flasher"). In the past three years, U.S. sales of jeanswear bearing the Cowboy Mark have exceeded $355 million and Canadian sales have grossed more than $7.9 million. During the same period, Blue Bell has spent more than $32 million in advertising and promoting its Cowboy mark jeanswear in the U.S. and more than $500,000 in Canada.

Blue Bell sold its Wrangler jeanswear in Canada through a wholly-owned subsidiary, Blue Bell Canada, Inc. ("Blue Bell Canada"), until losses led the company to scale down its Canadian operations. On October 21, 1988, Blue Bell sold all of its capital stock in its Canadian subsidiary to Western Glove, an established Canadian apparel manufacturer which manufactured garments under its own private label and under license from Calvin Klein. Blue Bell and Western Glove simultaneously entered into an exclusive licensing arrangement (the "License Agreement" or the "Agreement"). Pursuant to the License Agreement, Blue Bell supplied Western Glove with all of the specifications needed to manufacture Wrangler jeans and with authority to sell those jeans under the full range of trademarks and trade dress; in return, Western Glove agreed to pay royalties as a flat fee or as calculated as a percentage of net sales of the licensed products if above a certain threshold, promised not to use Blue Bell patterns or trademarks to make any non-Wrangler products, and promised to immediately report in writing any attempt by any third party to imitate Wrangler trademarks, trade dress, or design features. Article 4 of the License Agreement also entitled Western Glove to purchase certain American-made products from Blue Bell at a discount of 33% from the list wholesale price through October, 1990 and 20% thereafter, unless the parties negotiated otherwise.

The License Agreement provided for binding arbitration in Article 22:

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, . . . shall be settled by arbitration in accordance with the Rules of the American Arbitration Association (including supplementary procedures of international arbitration). Arbitration shall be conducted in the English language at New York, New York, United States of America, and the award of the arbitrators shall be final and enforceable.

The License Agreement provided for termination in Article 13. Article 13.7 allowed Blue Bell to terminate the Agreement should Western Glove "become affiliated, directly or indirectly, with any competitor of Licensor [Blue Bell]." Article 13.2 allowed either party to terminate by giving ninety days' written notice to the other for any material breach, "such termination to be effective unless the

other party remedies the breach or default specified in the notice before the end of such ninety (90) days."

From 1988 to 1990, Western Glove manufactured its licensed Canadian jeanswear out of the original Blue Bell Canadian plant in Renfrew, Ontario, which it subleased from Blue Bell. In 1990, Western Glove terminated its sublease on the Renfrew plant and transferred operations to a plant in Winnipeg, where Western Glove was headquartered and where it had always produced Western Glove jeanswear under its own "private label". Blue Bell alleges that the motive for moving production of the Wrangler jeans to Winnipeg was solely to facilitate Western Glove's planned "knock-off" of the Prorodeo model. Western Glove alleges that the operation of the Renfrew plant was too expensive to continue, and that these expenses were responsible for the losses suffered by Blue Bell Canada.

Once operations were consolidated in Winnipeg, Blue Bell alleges that Western Glove took actions which amounted to a breach of the license agreement. The first breach occurred when Western Glove continued to order American-made merchandise from Blue Bell with purchase orders listing the price at the 33% discount for nearly a year after the end of October, 1990. Blue Bell did not catch the error and billed Western Glove at a 33% discount, pursuant to the prices listed on Western Glove's purchase orders, until October, 1991. Western Glove knew it was taking an excessive discount, and passed the discount on to its customers by not levying price increases scheduled to go into effect in 1991.

Western Glove's second infraction was more serious and involved an alleged copying of the patterns, trademarks and trade dress of the Wrangler Prorodeo jeans. By March, 1991, G.A. Boulet, Inc. ("Boulet"), a Canadian boot company based in Quebec, was ordering jeans manufactured by Western Glove to sell under its own "Boulet" label as a promotional item to spur sales of its Western-style boots. Blue Bell alleges that Boulet specifically asked Western Glove to develop for them a "Wrangler-style" jean, and that in producing the Boulet jean, Western Glove copied two of the patterns originally supplied by Blue Bell for the production of its Prorodeo model. Blue Bell also alleges that Western Glove supplied Boulet with a "pocket flasher" trade dress directly copied from and confusingly similar to the Wrangler Cowboy Mark.

In November, 1991, John Neal ("Neal"), Blue Bell's then-Director of Western Retail Marketing and Licensing saw an advertisement for "Boulet Rodeo Jeans" which appeared in the program of the Canadian Finals Rodeo next to an ad for Wrangler Prorodeo jeans. Noting the similarity between the trade dress labels, Neal ordered a pair of the Boulet Rodeo Jeans. Upon receipt, he checked "CA" number, a manufacturer's unique identification required by the Canadian government, which proved that the Boulet Rodeo jeans were manufactured by Western Glove. Neal wrote a letter dated January 22, 1992, requesting that Western Glove "stop attaching the Wrangler look-alike back pocket tag on the Boulet jean and remove any and all tags already attached," and stated that Western Glove was violating the License Agreement.

By this time (in October, 1991), Blue Bell had caught Western Glove's continuing, now unauthorized use of the 33% discount. In December, 1991, Blue Bell's credit department invoiced Western Glove for $232,000, the amount which Blue Bell calculated it was owed for the difference between the 33% rate and the 20% rate (the "December 1991 invoice"), and had informed Western Glove that as of January 1, 1992, Blue Bell intended to bill Western Glove for merchandise at wholesale list prices, not the 20% provided for by the License Agreement. The companies now scheduled a meeting to discuss the issues of the discount and the Boulet jeans. On February 6, 1992, after two Blue Bell officers met with Western Glove officers in Canada, Blue Bell was left with the impression that all Boulet Rodeo jeans were being taken off the market, and that Western Glove would pay the December, 1991 invoice.

However, negotiations continued about both matters until March, 1992, when Blue Bell discovered that Boulet was showing its Boulet Rodeo jeans at the Canadian American Western Apparel Trade Show (held in

Calgary, Alberta, from February 29–March 2) and accepting orders for "at once" and fall 1992 delivery. On March 20, 1992, Blue Bell put Western Glove on "credit hold," refusing to ship any merchandise until Western Glove at least paid the December, 1991 invoice. Western Glove paid the invoice under protest three days later, on March 23. However, at this point it did not offer to buy back all Boulet Rodeo jeans from G.A. Boulet.

### Prior Proceedings

On March 26, 1992, Blue Bell served a demand for arbitration on Western Glove. Five of the eight "claims and controversies" to be arbitrated concerned the Boulet Rodeo jean, one concerned Western Glove's "willful and repeated taking of 33% discounts after October 22, 1990," one concerned Western Glove's applications for registration in Canada of other American Blue Bell trademarks, and one was whether the License Agreement "is or should be terminated." On April 1, 1992, Blue Bell secured a temporary restraining order (the TRO) from this Court against the manufacture, distribution, or sale of jeanswear with counterfeit imitations of Blue Bell's trademarks and trade dress by Western Glove. The next day Western Glove complied with the TRO by ordering a recall of the Boulet Rodeo jeans. On April 17, 1992, the TRO was vacated and a preliminary injunction was entered on consent on the same terms as the TRO.

Pursuant to the arbitration clause in Article 22 of the License Agreement, the parties arbitrated their dispute in New York from June 29 to July 2, 1992. All papers were considered fully submitted on July 24, 1992, and the Arbitrator rendered his award on September 30, 1992. Blue Bell does not contest the correctness of any of the procedures followed in the course of the arbitration.

The Arbitrator issued a two-page opinion which permanently enjoined Western Glove from manufacturing jeans upon the same terms as those contained in the TRO and the preliminary injunction, and directed Western Glove to pay $270,170 in damages to Blue Bell. But the Arbitrator let Western Glove take measures to keep its underlying license in paragraph 3 of the Award, in what Blue Bell refers to as the "cure" ruling:

> 3. In the event Respondent [Western Glove] fails to make timely payment of the amount directed to be paid pursuant to [this award] then the License Agreement is to be declared terminated by Claimant [Blue Bell] effective October 31, 1992.... In the event Respondent makes timely payment of the amount due pursuant to paragraph 2 [of $270,170] hereof, Respondent will have cured any material breach of its obligations under the License Agreement.

On October 19, 1992, Western Glove sent Blue Bell a check in the amount of $270,170 in United States dollars certified by the Royal Bank of Canada. On November 10, 1992, Blue Bell filed this motion to vacate the Award.

It is certain that, in comparison with the sales of Blue Bell licensed jeans, sales of the Boulet Rodeo Jeans were small: although the parties cannot agree on the number, apparently fewer than 1,000 pairs were sold, and Blue Bell itself indicates in its brief that only $20,170 of the Award represents disgorgement of all profits earned by Western Glove on shipments of the Boulet Rodeo jean. (Pl.Mem. of Law at 16). As Blue Bell points out, however, the damage to its trademarks and goodwill may be materially greater, since it is unknown how many customers may have judged Wrangler jeans and decided not to buy on the basis of the Boulet jean's allegedly inferior quality.

Blue Bell alleges that Western Glove has consistently acted in bad faith, and that it is entitled to terminate the license since (despite Western Glove's new, written License Compliance Program) the Canadian company is only waiting for an opportunity to cheat again. Western Glove, in turn, alleges that Blue Bell has been trying to find an excuse to cancel their license ever since the elimination of tariffs under the Canada–United States Free Trade Agreement, effective in 1990, made shipping American-made products into Canada more profitable than earning royalties under the terms of the License Agreement.

## Discussion

Blue Bell alleges two grounds for vacating paragraph 3 of the Award: that the Arbitrator's "cure" ruling is plainly a rewriting of the License Agreement in excess of his authority under 9 U.S.C. § 10(d), and that the "cure" ruling was made in manifest disregard of applicable New York and federal law. Blue Bell argues that since trademark infringement causes irreparable injury as a matter of law, and since a licensee's fraud, dishonesty and untrustworthiness are not amenable to cure, the Award is in plain contradiction to existing law.

### Statutory Vacatur Of an Arbitration Award

Under Section 10 of the Federal Arbitration Act (FAA), 9 U.S.C. § 10, there are four possible grounds for vacating an arbitration award. Briefly, these are: fraud or corruption in the proceeding, bias on the part of the arbitrator, refusal by the arbitrator to consider relevant evidence or other misbehavior on his part, and failure to exercise his power properly. 9 U.S.C. § 10(a)-(d); *Cook Chocolate Co. v. Salomon Inc.*, 748 F.Supp. 122, 126 (S.D.N.Y.1990) (Sweet, D.J.). Blue Bell has alleged only the last, and states that under Section 10(d) the award must be vacated because the arbitrator exceeded his power to interpret the parties' agreement bestowed upon him by their contract.

■ A party seeking to overturn an arbitration award is under a heavy burden to prove that the standards for such relief have been met, (*id.*) especially since the it is the Second Circuit's policy to read very narrowly the courts' authority to vacate arbitration awards pursuant to Section 10(d) of the FAA. *Blue Tee Corp. v. Koehring Co.*, 808 F.Supp. 343 (S.D.N.Y.1992) (Sweet, D.J.); *John T. Brady & Co. v. Form–Eze Systems, Inc.*, 623 F.2d 261, 264 (2d Cir.1980), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980); *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 703 (2d Cir.1978). Any "colorable justification" will support an arbitral award. *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir.1991); *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir.1988).

■ But an arbitral award may be overturned on the grounds that the arbitrator exceeded his powers, or *exces de pouvoir*. This limit does not exist so that a party dissatisfied with the result may attempt to destroy it, but so that the arbitrator may decide only the dispute that the parties submitted to him. This is necessary to any functioning system of arbitration since:

> Arbitral jurisdiction is entirely consensual. . . . The arbitrator's powers are derived from the parties' contract. Hence, in the classic sense, an arbitrator is not entitled to do anything unauthorized by the parties: arbiter nihil extra compromissum facere potest. An arbitral award rendered within the framework of the common agreement of the parties is itself part of the contract and hence binding on them. Conversely, a purported award which is accomplished in ways inconsistent with the shared contractual expectations of the parties is something to which they had not agreed. The arbitrator has exceeded his power. . . . Without [exces de pouvoir], arbitration would lose its character of restrictive delegation and the arbitrator would become a decision maker with virtually absolute discretion; whatever limits may have been prescribed by the parties would become meaningless because the arbitrator would be answerable effectively to no one. Exces de pouvoir thus is the conceptual foundation of control for arbitration.

W. Michael Reisman, *The Breakdown of the Control Mechanism in ICSID Arbitration*, 1989 Duke L.J. 739, 745 (1989) (citations omitted). *See generally* W. Michael Reisman, *Nullity and Revision: the Review and Enforcement of International Judgments and Awards* (1971).

■ Awards which cannot be based upon the parties' contract will be vacated under Section 10(d), but the proper response is to remand the case to the arbitrator. In *Collins & Aikman Floor Coverings Corp.*, 736 F.Supp. 480 (S.D.N.Y.1990) (Sweet, D.J.), an award was remanded to the arbitrator for clarification on the grounds that no provision of the parties' agreement allowed for com-

missions for sales made by petitioner after termination, and the award as rendered could only be explained by including post-termination commissions. In *Harry Hoffman Printing v. Local 261*, 950 F.2d 95, 99 (2d Cir.1991), the court found it

> unmistakable that, in reaching its decision, the Panel did not merely misapply principles of contractual interpretation or misinterpret the CBA [collective bargaining agreement], but drew upon a concept upon which it was not entitled to rely. The Panel based its conclusion on the concept of "elementary due process.".

Assuming that the unauthorized use of the steeper discount is a material breach, Western Glove remedied this breach when it paid Blue Bell the December, 1991 invoice of $232,000 on March 23. Assuming, also, that distribution of the Boulet Rodeo jean was a material breach, Western Glove remedied this when it ordered a recall of the jeans in April, 1992. Since Blue Bell admits that it gave written notice of termination for material breach on March 26, 1992 (Pl. br. at 23), the two methods for curing the alleged breaches—the payment of the money owed and recall of the jeans—were both applied within the 90–day limit. Therefore, the Award would not contradict Article 13.2 of the License Agreement if it allows for *any* alternative inference or explanation to Blue Bell's theory of the damages as remedies for material breach. The existence of any alternative reasonable inference justifies the Award. *United Steelworkers of Amer. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597–98, 80 S.Ct. 1358, 1361–62, 4 L.Ed.2d 1424 (1960); *Sperry Int'l Trade v. Government of Israel*, 689 F.2d 301, 306 (2d Cir. 1982); *Carte Blanche (Singapore) v. Carte Blanche Int'l, Ltd.*, 683 F.Supp. 945, 951 (S.D.N.Y.1988).

■ The Arbitrator made no findings of fact and drew no conclusion of law. "We are thus left to theorize as to the basis of the Award, and New York law requires that all reasonable efforts be made to find a ground on which to sustain it." *Sperry v. Government of Israel*, 689 F.2d at 306. The most likely choices here include compensation for the harm done to Blue Bell's trade mark, compensation for breaches of the agreement which did not rise to the level of "material" breaches, or equitable relief (including attorneys' fees) as requested by Blue Bell in its initial demand for arbitration. Equitable relief seems especially likely since the Lanham Act (15 U.S.C. § 1051 *et seq.*), which would entitle Blue Bell to damages from trademark infringement in a domestic action, does not apply in Canada.[1] Since it is not clear that the Award was made pursuant to the "cure" provisions in Article 13.2 at all, the Court need not consider the question of whether the restrictions on a court's equitable power to extend the time for "cure" apply to an arbitrator, *see Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889–90 (2d Cir.1990).

■ While the Arbitrator did not specify how he calculated the Award, this will not prevent a court from finding an award within the power of the arbitrator. Arbitrators are not required to explain their rationale in making their awards. *See Blue Tee*, 808 F.Supp. 343; *Koch Oil, S.A. v. Transocean Gulf Oil Co.*, 751 F.2d 551, 554 (2d Cir.1985). Nor are they required to state the factual or legal grounds upon which their award is based. *See e.g., Form–Eze*, 623 F.2d at 264; *Kurt Orban Co. v. Angeles Metal Sys.*, 573 F.2d 739, 740 (2d Cir.1978). An award must be confirmed provided any colorable grounds for it can be inferred from the facts of the case. *Kurt Orban*, 573 F.2d at 740. Since alternative grounds are possible here, the award should not be vacated under the FAA.

---

1. Since it could be the intention of neither party to break the law of either nation in their agreement, part of the arbitrator's authority is to apply the law which the parties agreed to. "Where the parties have agreed that the arbitral body is to decide a denied set of claims which includes, as in these cases, those arising from the application of American ... law, the tribunal therefore should be bound to decide that dispute in accord with the national law giving rise to the claim." *Mitsubishi Motors v. Solar Chrysler–Plymouth*, 473 U.S. 614, 636–37, 105 S.Ct. 3346, 3359, 87 L.Ed.2d 444 (1985). The License Agreement states, in Article 25, that it shall be construed according to law of New York, although Article 21 adds that any provision in violation of either Canadian or American law shall be void.

## Manifest Disregard of Law

Blue Bell objects to the Award on grounds that it is in "manifest disregard" of settled New York law. Blue Bell argues that Western Glove's bad faith has resulted in irreparable harm to Blue Bell's trademarks and cannot be "cured" within the meaning of the law, thus entitling Blue Bell to termination of the license agreement.

The term "manifest disregard" of law in the context of arbitration was coined in *Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 186–88, 98 L.Ed. 168 (1953) (disallowing arbitration of securities law claims), *overruled on other grounds by Rodriguez de Quijas v. Shearson/American Express Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (explicitly permitting arbitration of securities law claims):

> In unrestricted submissions, such as the present margin agreements envisage, the interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation.

Following *Wilko*, "manifest disregard" became an additional, nonstatutory ground for vacating an arbitration.

> Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law ... Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.... The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it.

*Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche International*, 888 F.2d 260, 265 (2d Cir.1989), *quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933–34 (2d Cir.1986) (citations omitted). The standard for judicial review for "manifest disregard" is at least as strict and as limited as for statutory vacatur under Section 10. *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir.1991).

This is consistent with the view of arbitration as a separate system, subject to control by the courts but not to appeal on substantive issues of law. "[A] control system may enforce an award that would be struck down, (and indeed, should be) had it been a judgment on appeal. The point, which is elusive in a national setting ... is clearer in international arbitration." Reisman, *supra* page 11, at 748.

In this international arbitration, nothing put before the Court by Blue Bell conclusively demonstrates that the Arbitrator's decision was in manifest disregard of law. Assuming the Arbitrator found breach of contract and trademark infringement, the problem with Blue Bell's argument for the incurability of "irreparable harm" is that it has cited only cases which do not turn on the possibility or impossibility of "cure" but on whether the court, under the circumstances, should grant an injunction. The correct analogy here is that the "irreparable harm" would entitled Blue Bell to a permanent injunction, but not necessarily a termination of its License Agreement. The injunction in this case against Western Glove's production of Boulet Rodeo jeans has been granted and made permanent by the Award itself. The damages awarded can be construed to be compensation for the temporary harm caused by approximately a thousand pairs of jeans sold as a promotional item for Western-style boots. Blue Bell has not cited to this Court any case which states that trademark infringement is such a permanent harm that it may never, under any circumstances, be compensated for in money damages or that it automatically cancels all agreement between the parties.

■ Blue Bell's second argument—that Western Glove's fraud entitles it to recision—overstates the law. In New York, fraud which goes to the root of the matter or the essence of the contract under certain circumstances does entitle the defrauded party to immediate recision. *Southland Corp. v. Mir*, 748 F.Supp. 969, 984 (E.D.N.Y. 1990) (willful scheme to deprive franchisor of its contract rights through money-order

scam entitled franchisor to claim for fraud); *Wisser Co. v. Mobil Oil Corp.,* 730 F.2d 54, 59 (2d Cir.1984) (continual practice of selling misbranded gasoline under Petroleum Marketing Practices Act was breach entitling franchisor to terminate franchise). Whether or not Western Glove's behavior amounted to fraud so egregious that it entitled Blue Bell to recision without possibility of cure was a question for the arbitrator to decide. Not every breach of contract automatically results in a right to rescind, *see Lippo v. Mobil Oil Corp.,* 776 F.2d 706 (7th Cir.1985). The rule is really a restatement of one of the principles in contract law: if one party essentially refuses to perform the contract, or makes it impossible for the contract to be performed, the other party is excused from performance as well.

In New York, debate over whether a termination provision with notice and cure requirements in a contract makes termination without notice and cure impossible seems to have ended in favor of the view that fraud may entitle one party to recision regardless of notice and cure, but it turns on the quality of the fraud. *In re Best Film & Video Corp.,* 46 B.R. 861, 874 (E.D.N.Y.1985). The real issue is the type and extent of the breach. "Courts, using their good sense, will be able to tell breaches which excuse the obligation to give notice from breaches which do not." *Id.* at 875, *quoting Corbin on Contracts,* § 1266, at 369–370 (Supp.1982).

Western Glove put before the arbitrator evidence that it had thought there was nothing wrong in using the Wrangler patterns as a base, that it had changed enough of the designs to make the Boulet Rodeo Jean unique, and that it did not realize that Wrangler would consider the "pocket flasher" an infringement. Western Glove alleges that it operated in good faith, and the Arbitrator evidently agreed, or at least believed the breaches curable. The decision in any case belongs to the arbitrator and not to this Court.

As international trade has expanded in recent decades, so too has the use of international arbitration to resolve disputes arising in the course of that trade.... If [arbitration tribunals] are to take a central place in the international legal order, national courts will need to shake off ... unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal. To this extent, at least, it will be necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration.

*Mitsubishi Motors,* 473 U.S. at 638–39, 105 S.Ct. at 3360.

**Respondent's Cross Motion for Confirmation of the Award**

"Absent a statutory basis for modification or vacatur, the district court's task [is] to confirm the arbitrator's final award as mandated by [the FAA] ..." *Cook Chocolate,* 748 F.Supp. at 130, *quoting Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir. 1987). As both of Blue Bell's arguments for vacatur have been disposed of, the award as ordered by the Arbitrator should be confirmed.

**Conclusion**

For the reasons given above, the plaintiff's motion to vacate is denied and the defendant's cross-motion to confirm is granted. Each party is to bear its own costs.

It is so ordered.