Frank ACQUAIRE, et al., Plaintiffs,

v.

CANADA DRY BOTTLING,
et al., Defendants.

No. 90–CV–4005 (JG).

United States District Court,
E.D. New York.

Nov. 6, 1995.

Kenneth F. McCallion, Goodkind, Labaton, Rudoff & Sucharow, New York City, for New York Plaintiffs.

Gerald J. McMahon, New York City, for New Jersey Plaintiffs.

Peter E. Greene, Jonathan Lerner, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendants Canada Dry Bottling Company of New York, Harold Honickman, Dennis E. Berberich and Concord Beverage.

William Escobar, Kelley, Drye & Warren, New York City, Attorneys for Defendant Transervice Lease Corp.

Richard S. Atwater, Lustig & Brown, Buffalo, New York, for Defendants Ronald J. Srein and Evans, Conger, Broussard & McCrea.

Dennis P. Orr, Kenneth S. Prince, Shearman & Sterling, New York City, for Defendants Cadbury Beverages, Inc., Canada Dry U.S.A., James Smith, Schweppes U.S.A. and Cadbury Schweppes PLC.

Sidney Fox, Barry Levy, Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City, for Defendants Soft Drink and Brewery Workers, Union Local 812 International Brotherhood of Teamsters and Anthony Rumore.

George B. Yankwitt, Steven Stimell, Robinson Silverman Pearce Aronsohn & Berman, New York City, Attorneys for Defendant Soft Drink and Brewery Workers, Union Local 812 Retirement Fund.

Irving Anolik, New York City, for Defendant Louis Rumore.

Laura A. Sanom, Vincent E. Reilley, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Northbrook Property and Casualty Insurance Co.

## MEMORANDUM AND ORDER

GLEESON, District Judge:

Plaintiffs brought this action against approximately 40 defendants, claiming violations of the Sherman, Clayton, Robinson–Patman, Lanham, and Taft–Hartley Acts, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Employee Retirement Income Security Act ("ERISA") and various state laws of New York and New Jersey. Plaintiffs, of whom there are more than 130, are wholesale distributors of soft drink products that have been manufactured or bottled by defendants Canada Dry Bottling Company of New York ("Canada Dry"), Coors Distributing Company of New York, Inc. ("Coors"), Cadbury Beverages, Inc. ("Cadbury"), and their affiliates.[1] Some of the plaintiffs are sole proprietors and others are small corporations.

The 260–page complaint has been amended twice and now sets forth 36 counts. It alleges generally that Canada Dry, Coors, Cadbury, Coke and others conspired to restrain trade in soft drink products by: fraudulently inducing plaintiffs to buy distribution franchises for products produced by the manufacturing and bottling defendants; using their alleged control of the soft drink and mixer market to force plaintiffs to lease their delivery trucks and obtain liability insurance through designated companies; using this alleged market control to force the corporate plaintiffs to enter into collective bargaining agreements with the defendant Soft Drink and Brewery Workers Union Local 812 ("Local 812"), and to force the individual plaintiffs to become members of the union; allowing plaintiffs to increase the value of the franchises by expanding distribution of Canada Dry and Coors products, and then employing price discrimination, price-fixing, breach of the franchise agreements, and tortious interference with plaintiffs' businesses to drive plaintiffs out of business and take their franchises without compensation; laundering the

---

1. Causes of action that were originally asserted against Pepsico, Inc., the Coca–Cola Company, and their affiliates, were subsequently discontinued.

proceeds of the defendants' allegedly unlawful conduct; and "otherwise running their business empire as a racketeering enterprise through threats of intimidation in furtherance of a scheme to extort, to defraud and to monopolize the market for soft drinks and mixers in the New York area." (Second Amended Complaint ("2d Am.Compl.") ¶ 2.)

Joined as defendants are the insurance companies, truck leasing companies, insurance brokers, and labor organizations that plaintiffs claim stood to benefit from the alleged conspiracy. Separate claims have also been alleged against these additional defendants.

Defendants Canada Dry, Coors and others have moved to compel arbitration pursuant to an arbitration clause contained in all of the distribution agreements. They have also moved to stay the remainder of the action while arbitration is proceeding. In the alternative, they move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The following defendants have also moved to dismiss the claims against them: Cadbury and its affiliates; Northbrook Property and Casualty Insurance Company ("Northbrook"); Evans, Conger, Broussard & McCrea ("ECBM") and Ronald Srein, an ECBM partner; Transervice Lease Corporation ("Transervice"); Local 812; the Soft Drink and Brewery Workers Union Local 812 Retirement Fund ("the Retirement Fund"); and Anthony and Louis Rumore, who are alleged to be officials of Local 812 and trustees of the Retirement Fund.

In addition, on May 3, 1995, plaintiffs obtained an order to show cause, directed to Canada Dry, why it should not be held in contempt of a preliminary injunction issued in this case on April 12, 1993.

For the reasons stated herein, the motion to compel arbitration is granted, the application for a contempt citation is denied, and all remaining claims and motions are stayed pending the outcome of the arbitration.

## I. The Motion to Compel Arbitration

### Background

In 1977, Canada Dry began offering "equity routes" to its employee distributors for $15,000. Those who accepted became independent "equity distributors," exclusively entitled to sell Canada Dry products to customers in designated geographic territories throughout New York and New Jersey. The terms of the arrangement were set forth in a standard distribution contract, executed by the distributor and an authorized representative of Canada Dry. In 1982, Canada Dry offered its distributors a modified version of the prior distribution contract, entitled "Distributor's Agreement." The ways in which this contract differed from the earlier one are not important to disposition of the instant motion. (2d Am.Compl. ¶¶ 94–101.)

Paragraph 22 of the "Distributor's Agreement" contained an arbitration clause, which reads as follows:

> Except as otherwise provided in this Agreement, any and all disputes or disagreements between the Company and the Distributor concerning the interpretation or application of the provisions of this Agreement shall be determined in arbitration before Harry Silverman, Esq. (or the person then acting as the replacement arbitrator for Harry Silverman, Esq. in the majority of Distributor Agreements which previously named Harry Silverman, Esq. as arbitrator, between soft drink bottling companies in New York City and Distributors) in accordance with the rules of the Civil Practice Law and Rules ... The award of the arbitrator shall be final and binding upon the parties. A request for arbitration must be made in writing with a copy to the other party within thirty (30) days after the facts arose which form the basis of the dispute.

The Distributor's Agreement provided that its terms would expire on September 30, 1990.

Plaintiffs allege that at all pertinent times, defendant Harold Honickman had a controlling interest in Canada Dry and several of the other defendant soft drink manufacturers. In 1986, pursuant to an agreement with Adolph Coors Company, Honickman formed Coors Distributing Company of New York, Inc. ("Coors") to distribute products bearing the Coors label. He then began recruiting Canada Dry distributors to perform the dis-

tribution tasks. The following year, the Coors distributors were offered a standard distribution contract which incorporated all the terms of the Canada Dry Distributor's Agreement, including the arbitration clause. (2d Am.Compl. ¶¶ 14, 104–05.) [2]

During the summer of 1990, Canada Dry and Coors expressed an intention not to renew the distribution contracts that were due to expire on September 30, 1990. As it turned out, none of the contracts were renewed after that date. Two months later, on November 20, 1990, plaintiffs filed the instant action. (*Id.* ¶¶ 188–90.) On the same day, they filed a motion for a temporary restraining order and preliminary injunction, which was apparently abandoned pending settlement discussions that took place before the Honorable Zachary W. Carter, United States Magistrate Judge.

On January 3, 1992 plaintiffs filed an amended complaint with the consent of the defendants. Early in 1993, plaintiffs again moved for a temporary restraining order and preliminary injunction; the requested relief was granted in part and denied in part by

order dated April 15, 1993.[3] The Second Amended Complaint was filed on March 1, 1993, and the instant motions followed in accordance with a scheduling order issued April 14, 1993, by Magistrate Judge Carter.

In May 1995, the case and all pending motions were transferred to this Court. After considering the issues raised in the parties' briefs, the Court heard oral argument on September 22, 1995.

### Discussion

■ Congressional policy, as it is embodied in the Federal Arbitration Act, 9 U.S.C. §§ 1–15 (1988) ("the Act"), favors enforcement of arbitration clauses in commercial contracts.[4] *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). This preference is expressed in a provision of the Act which states that written agreements to arbitrate in such contracts "shall be valid, irrevocable, and enforceable, save upon such

---

**2.** Because Canada Dry and Coors are subject to the same agreement with the distributors, they are sometimes referred to herein as "Canada Dry/Coors."

**3.** This decision was affirmed in *Acquaire v. Canada Dry Bottling Co., Inc.,* 24 F.3d 401 (2d Cir. 1994).

**4.** Plaintiffs appear to contend, in papers submitted two years after the original briefs were filed, that the Act does not govern this particular arbitration agreement. (Pls.' Supplemental Memorandum at 4–5.) The contention is not only belated; it also conflicts with their own reliance, in their prior submissions, on federal law construing the Act. Although I do not agree that the New York cases plaintiffs cite are any more favorable to their position than the federal ones, *see infra* note 9, this new argument is significant and must be addressed.

Plaintiffs rest their argument that state law should govern this motion on the phrase in Paragraph 22 of the Distributor's Agreement that reads: "disputes ... shall be determined in arbitration before Harry Silverman, Esq. ... *in accordance with the rules of the Civil Practice Law and Rules.*" (Emphasis added.) Plaintiffs cite *Volt Information Sciences v. Board of Trustees,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), for support. In *Volt,* the Supreme Court held that while the Act preempts state laws that

render arbitration provisions unenforceable, a choice-of-law clause providing that the contract would be governed by California law was nevertheless enforceable. *Id.* at 478–79, 109 S.Ct. at 1255–56. This result was required because allowing "the enforcement of agreements to arbitrate under different rules than those set forth in the Act" was consistent with the Act's "primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms." *Id.*

The reference to the New York CPLR in Paragraph 22 is quite different from the choice-of-law clause considered in *Volt.* Its position in the arbitration provision, where it modifies only the actions of the named arbitrator, is inconsistent with an intention to have New York law govern the entire provision. The structure of the arbitration clause suggests that the parties intended only to have the arbitrator apply New York law once arbitration was commenced. For these reasons, and because the Distributor's Agreements embody transactions in interstate commerce, the Act must govern the arbitration of disputes arising out of these contracts. *Volt,* 489 U.S. at 476, 109 S.Ct. at 1254; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 401, 87 S.Ct. 1801, 1804, 18 L.Ed.2d 1270 (1967); *Varley v. Tarrytown Associates, Inc.,* 477 F.2d 208, 209 (2d Cir.1973); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1068–69 (2d Cir.1972).

grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A further provision requires judicial proceedings to be stayed pending arbitration if the court is satisfied that the issues presented are arbitrable—*i.e.*, contemplated by an agreement to arbitrate. 9 U.S.C. § 3. These statutory provisions are mandatory, a point emphasized by the Supreme Court in *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985):

> [T]he [Arbitration] Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. Thus, insofar as the language of the Act guides our disposition of this case, we would conclude that agreements to arbitrate must be enforced, absent a ground for revocation of the contractual agreement.

*See also Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987).

■ Accordingly, a court considering a motion to compel arbitration must determine whether the issues presented are arbitrable. *First Options v. Kaplan*, — U.S. —, —, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). First, it must determine whether the parties agreed to arbitrate. If they have, it must then assess the scope of their agreement to determine whether it encompasses the asserted claims. *Genesco*, 815 F.2d at 844. " '[D]oubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir.), *cert. dismissed*, 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991) (quoting *Moses H. Cone Memorial Hospital*, 460 U.S. at 24–25, 103 S.Ct. at 941); *see also Coudert v. Paine Webber Jackson & Curtis*, 705 F.2d 78, 81 (2d Cir.1983).

Third, the court must decide whether any federal statutory claims that have been asserted were intended by Congress to be non-

arbitrable. *Genesco*, 815 F.2d at 844. Fourth, where some but not all of the claims in the case are arbitrable, the court must determine whether to stay proceedings as to the remaining claims. *Id.*

## A. *The Agreement to Arbitrate*

There is no dispute that the plaintiffs expressly agreed to arbitrate their disputes with Canada Dry and Coors concerning the interpretation or application of the Distributor's Agreement. I thus need not engage in an analysis of whether such agreement was reached. However, plaintiffs challenge the enforceability of the agreement, claiming (1) that it was the product of economic coercion and fraud; (2) that Canada Dry and Coors have waived their rights under the arbitration clause contained in Paragraph 22; (3) that the clause no longer has effect; and (4) that the named arbitrator and/or the method of selecting him is biased in favor of defendants. Finally, plaintiffs contend that the claims they have raised in this action are not contemplated by Paragraph 22 of the Distributor's Agreement. These contentions are addressed in turn.

### 1. *Fraud*

■ Plaintiffs do not clearly enunciate the basis for their argument that their signatures on the Distributor's Agreements were obtained by fraud. In order to avoid arbitration on this ground, they must allege fraud in the inducement[5] not of the contract generally, but *of the arbitration clause itself*. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967). Claims of fraud in the inducement of the entire contract must be submitted to arbitration. *Id.* Claims of fraud going to the execution of the contract as a whole (otherwise known as "fraud in the factum") have, however, been allowed to avoid the arbitral forum, at least for the purpose of determining the validity of the arbitration agreement. *See, e.g., Kyung In Lee v. Pacific Bullion, Inc.*, 788 F.Supp. 155, 157 (E.D.N.Y.1992); *see also Cancanon v.*

---

**5.** Fraud in the inducement occurs when a person is induced by false promises to enter into a contractual arrangement. *Kyung In Lee v. Pacif-*

*ic Bullion, Inc.*, 788 F.Supp. 155, 156–57 (E.D.N.Y.1992).

*Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 999 (11th Cir.1986). This type of fraud occurs when, for example, the misrepresentation goes "to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect." *Kyung In Lee*, 788 F.Supp. at 157 n. 1 (quoting E. Farnsworth, Contracts § 4.10 (2d ed. 1990)).

■ The instant complaint does not allege facts that make out either fraud in the inducement or fraud in the factum. There is no suggestion that plaintiffs were misled in any way, either to believe that the contract they were signing was not binding, or that it would yield a benefit it could not. Plaintiffs do allege that the distributors were forced by threats and time pressure to sign agreements whose terms they did not understand. These claims suggest coercion, perhaps, but not fraud. For these reasons, plaintiffs' contention that the arbitration is unenforceable on the ground of fraud lacks merit.

### 2. *Economic Coercion*

To support their claim that the arbitration provision of the Distributor's Agreement was the product of economic coercion, plaintiffs assert: (1) that at the time they signed the agreements, the distributors did not understand the significance of relinquishing their basic legal rights via an arbitration clause; (2) that they were forced to sign the agreements under extreme time pressure—specifically, while loading their trucks—and were not able to consult with counsel; (3) that they were coerced into accepting the contract terms on a "take it or leave it basis," thereby "creating a contract of adhesion"; (4) that defendants wrongfully threatened plaintiffs by stating that the contracts were non-negotiable, and in so doing, forced the distributors to either sign the agreement with its arbitration clause or lose their livelihoods; and (5) that due to Canada Dry's economic leverage, plaintiffs entered into arbitration agreements that contained "onerous" provisions that "never would be included in any contract negotiated at arms length between parties of equal bargaining power." (Pls.' Mem. at 29–31.)

■ The Act provides that arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Duress in the inducement of an agreement to arbitrate is a proper ground for revocation of the agreement. *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 756 (2d Cir.1967). The Supreme Court has accordingly directed that courts "remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 627, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985) (quoting 9 U.S.C. § 2); *Southland Corp. v. Keating*, 465 U.S. 1, 16 n. 11, 104 S.Ct. 852, 861 n. 11, 79 L.Ed.2d 1 (1984). Nevertheless, as with fraud in the inducement, an arbitrator must resolve claims that an *entire* agreement, containing an arbitration clause, was executed by duress. *See, e.g., Nilsen v. Prudential–Bache Sec.*, 761 F.Supp. 279, 287 (S.D.N.Y., 1991) ("claims of fraud or duress as reason to avoid enforcing the signed contract with its arbitration clause … themselves [are] subject to arbitration"); *Dale v. Prudential–Bache Secur., Inc.*, 719 F.Supp. 1164, 1169 (E.D.N.Y.1989) ("a claim of fraudulent inducement, duress or unconscionability involves the formation of the entire contract and must be determined by the arbitrator"); *International Imaging Materials, Inc. v. Oliverio*, No. CIV-88–638E, 1988 WL 137717, *1 (W.D.N.Y. Dec. 20, 1988) ("issues respecting the validity of the Agreement as a whole—such as duress or failure of consideration—are for the arbitrator").

■ Plaintiffs' factual allegations in support of the claim of economic coercion are not entirely clear. They appear to focus on the circumstances in which each Distributor's Agreement was signed, alleging no more than that the plaintiffs were forced to sign the contracts under time pressure without negotiation, and that they were informed they must sign in order to do business with Canada Dry and Coors. As these allegations go to the formation of each contract as a whole, the question whether they render

voidable the contractual arrangements between each plaintiff and the defendant bottling companies must be decided by the arbitrator.

 Even if the allegations could be construed to pertain to the plaintiffs' acceptance of Paragraph 22 alone, they still would not release plaintiffs from their contractual obligation to arbitrate. To establish that economic duress, or business coercion, induced the formation of a contract, the claimant must allege that he "was subjected to a 'wrongful threat precluding the exercise of ... free will.'" *Warnaco, Inc. v. Farkas,* 872 F.2d 539, 546 (2d Cir.1989) (quoting *Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533, 535 (1971)). Stated differently, a party relying on this defense to enforcement of a contractual obligation must show: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." *Gulf & Western Corp. v. Craftique Productions, Inc.,* 523 F.Supp. 603, 610 (S.D.N.Y.1981). An additional and essential element of the defense is that the party's acceptance of the contractual terms was "precipitated solely by duress and without hope of personal gain." *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 644 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir.1979).

 As a threshold matter, plaintiffs do not explain whether they were unhappy with Paragraph 22 of the 1982 agreement, or its predecessor clause in the 1977 agreement, or both. Whatever the case, they have failed to allege facts to suggest that the manner of defendants' insistence on inclusion of these provisions deprived plaintiffs of their free will. If plaintiffs were displeased with the 1977 contract, they had only to decline to accept it, and do business with other soft drink producers. If the 1982 contract was the focus of their discontent, the same alternatives presented themselves. Indeed, the complaint does not suggest that the alleged "concentration in the soft drink industry" that is the focus of this action began to materialize before 1986. (*See* 2d Am.Compl. ¶ 66.) Thus, there is no reason to suspect that before that time, plaintiffs' choice of soft drink producers was limited in any way. *Austin Instrument,* 29 N.Y.2d at 130–31, 324 N.Y.S.2d at 25–26, 272 N.E.2d at 535 (the exercise of free will is not hindered where there exist suppliers other than those with whom the plaintiff is dealing).

Further, plaintiffs have not alleged facts to suggest that defendants' insistence on arbitration was wrongful. For example, they have not attempted to characterize the second contract as an unlawful modification or breach of the prior agreement, and this Court consequently cannot infer that they were forced to accept altered terms without consideration. *See id.* (the defense of business compulsion is made out when "one party to a contract has threatened to breach the agreement by withholding goods unless the other party agrees to some further demand"). Rather, the facts alleged indicate that defendants acted within their rights. They were entitled to enter into contractual arrangements containing terms they considered acceptable, including arbitration clauses, and plaintiffs did not object to any provision of the Distributor's Agreement for its entire eleven-year term. The "threats" defendants are alleged to have made amounted to no more than assertions that the agreement they were entitled to insist upon was not negotiable. " '[I]t is not duress to threaten to take action which is legally permissible.'" *Kamerman v. Steinberg,* 891 F.2d 424, 432 (2d Cir.1989) (quoting *Hammelburger v. Foursome Inn Corp.,* 54 N.Y.2d 580, 593 n. 4, 431 N.E.2d 278, 285 n. 4, 446 N.Y.S.2d 917, 924 n. 4 (1981)); *DuFort v. Aetna Life Insurance Co.,* 818 F.Supp. 578, 582 (S.D.N.Y. 1993). At worst, defendants' alleged actions can be characterized as hard bargaining tactics that do not rise to the level of wrongfulness required to sustain the defense of duress. *Warnaco,* 872 F.2d at 546 ("hard bargaining positions" do not constitute economic duress); *see also Weinraub v. International Banknote Co.,* 422 F.Supp. 856, 859 (S.D.N.Y. 1976).

In addition, plaintiffs have not presented any facts suggesting that they did not stand to gain from the inclusion of Paragraph 22 of the Distributor's Agreement or its counter-

part in the 1977 agreement. Indeed, broad arbitration provisions like these are a form of security for all parties bound to them—they ensure that no one will face the expense and hardship of litigation when disputes arise that pertain to the contractual relationship. This protection benefitted plaintiffs every bit as much as it served defendants.

 Finally, in failing to assert a claim of economic duress during the decade between the first appearance of the Distributor's Agreements in 1982 and the present motions filed in 1993, plaintiffs have weakened, if not forfeited, their duress claim. "[I]t is well established under New York law that a party asserting duress must do so promptly." *International Halliwell Mines v. Continental Copper & Steel Indus.*, 544 F.2d 105, 108 (2d Cir.1976). In *Halliwell Mines*, the Second Circuit began its finding that an agreement executed two years earlier was not the product of economic duress as follows:

> [U]nder New York law a party seeking to avoid his contractual obligations on grounds of economic duress shoulders a heavy burden ... The burden necessarily increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question ...

*Id.* A party who fails to promptly challenge an agreement on the ground of duress waives the defense. *See New Orleans Flooring Supply, Inc., v. Kentile Floors, Inc.*, No. 93 Civ. 8158, 1994 WL 97505, at *2 (S.D.N.Y. March 18, 1994) ("A contract signed under duress is not void but voidable, and a party must move quickly or the defense is deemed waived and the contract ratified"); *Port Chester Electrical Constr. Corp. v. Hastings Terraces, Inc.*, 284 A.D. 966, 967, 134 N.Y.S.2d 656, 658 (2d Dep't 1954) (same). Plaintiffs' failure to challenge Paragraph 22 of the Distributor's Agreement for more than ten years substantially undercuts their current claim that it was procured by duress.

 Plaintiffs' claim that the circumstances under which they were required to sign the Distributor's Agreement resulted in a contract of adhesion is similarly without merit. "For an arbitration provision to be stricken as a contract of adhesion there must be a showing of 'unfairness, undue oppression, or unconscionability.'" *David L. Threlkeld & Co.*, 923 F.2d at 249 (citations omitted). Plaintiffs are signatories to a number of distributorship agreements which contain arbitration provisions similar to the instant one. The use of such provisions is typical in the industry, a fact which alone is sufficient to allow a conclusion that the plaintiffs were aware of its presence and effect in the contract. *Cf. Genesco*, 815 F.2d at 846 ("the widespread use of arbitration clauses in the textile industry puts a contracting party ... on notice that its agreement probably contains such a clause"). Therefore, it is difficult to conclude that defendants have taken advantage of plaintiffs' lack of knowledge and experience to any degree, much less one that could be considered unconscionable.

### 3. *Waiver*

Plaintiffs claim that Canada Dry and Coors have waived their right to have this dispute resolved by arbitration. Their primary basis for this contention is that Canada Dry acted inconsistently with an intent to arbitrate (1) by agreeing to submit substantive [6] factual and legal issues to this Court and litigating them aggressively; (2) by arguing, immediately after the first complaint was filed in 1990, that to the extent the case should be in another forum, it should be referred to the National Labor Relations Board ("NLRB"); and (3) by delaying to request arbitration for three years after the complaint was originally filed. As examples of defendants' willing submission to the Court's jurisdiction, plaintiffs point to, among other things, defendants' voluntary participation in court-assisted settlement negotiations, their compliance with Magistrate Judge Carter's resolution of two termination disputes, and their alleged success in "bottling the case up in federal court literally for years." (Pls.' Mem. at 14.)

---

**6.** The word "substantive" as used by plaintiffs (Pl.'s Mem. at 11) seems to mean "pertaining to the merits." To the extent that it does, it should be noted at the outset that the grant of a preliminary injunction, which is the only relief that has

been afforded to any party since the beginning of this litigation, "is not an adjudication on the merits." *Diversified Mortg. Investors v. U.S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir.1976).

Federal policy strongly favors arbitration, and consequently a party will not be found to have waived the right by participating in litigation unless a stay to allow arbitration would prejudice the other party. *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir.1985). "Whether or not there has been a waiver is decided in the context of the case, with a healthy regard for the policy of promoting arbitration." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir.1995).

A showing of delay in seeking arbitration is not alone sufficient to require a finding of prejudice. *Id.* Rather, as stated in *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir.1991):

> Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense.

*See also Bowers on behalf of NYSA–ILA Pension Trust Fund v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 263 (2d Cir.1990) (waiver found where movant did not call for arbitration until after being held liable by the court). Generally, "litigation of substantial issues going to the merits may constitute a waiver of arbitration." *Sweater Bee By Banff, Ltd. v. Manhattan Industries, Inc.*, 754 F.2d 457, 461 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985).

Courts tend to find that arbitration has been waived only when the party requesting it has engaged in substantially more litigative activity than has transpired in this action. *See, e.g., Leadertex,* 67 F.3d at 26 (defendant answered, counterclaimed, energetically pursued discovery and waited until the "eleventh hour, with trial imminent," before seeking arbitration); *Kramer,* 943 F.2d at 179 (defendant waited four years before requesting arbitration, filing several dispositive pretrial motions and appealing the denial of one all the way to the United States Supreme Court); *Frye v. Paine, Webber, Jackson & Curtis, Inc.*, 877 F.2d 396, 399 (5th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 493 (1990) (defendants engaged in more than eighteen months of discovery that would not have been available in arbitration, a trial had been held and aborted, the plaintiff had incurred expenses defending against defendants' counterclaims and a motion for a directed verdict, and two and one-half years had passed between the filing of the complaint and the demand for arbitration).

Where parties who assert a right to arbitration have made relatively little use of their presence in a judicial proceeding, courts almost invariably decline to find waiver. *Rush,* 779 F.2d at 888–89 (defendant did not waive arbitration by participating in pretrial discovery, or by filing a motion to dismiss and a subsequent answer, neither of which mentioned arbitration—even though it waited eight months to raise the issue); *Sweater Bee,* 754 F.2d at 459–60 (arbitration proper where defendant moved to dismiss complaint on grounds that went to the merits, moved for reargument when the prior motion was denied, engaged in discovery and in motion practice concerning discovery, and two years after the complaint was filed asserted a right to arbitration in its answer); *Carcich v. Rederi A/B Nordie,* 389 F.2d 692, 694 (2d Cir. 1968) (no waiver by third-party defendant who did not assert right to arbitration for almost two years while the principal suit was litigated); *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 412–13 (2d Cir.1959), *cert. dismissed,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960) (no waiver even though motion for stay was made nine months after commencement of litigation, and settlement discussions and discovery were conducted in the interim); *Kulukundis Shipping Co., S/A v. Amtorg Trading Corp.*, 126 F.2d 978 (2d Cir.1942) (no waiver even though party demanding arbitration did not assert it in its first answer and did not seek to include the demand in the answer until after the case was ready for trial).

Plaintiffs filed their original complaint in this action on November 21, 1990, two months after the Distributor's Agreement expired. Simultaneously, plaintiffs moved for a preliminary injunction, but they subsequently

abandoned that application. In January 1991, the time for the defendants to answer was extended to allow plaintiffs time to file an amended complaint. However, the following June, the parties agreed to enter into settlement discussions to negotiate new distributorship contracts. Six months later, in January 1992, plaintiffs filed a first amended complaint with the defendants' consent. Settlement discussions resumed shortly thereafter and continued before Magistrate Judge Carter until the spring of 1992. The time for defendants to answer or respond was again delayed during this period.

In May 1992, defendant Transervice moved to disqualify James Harmon, Jr., Esq., and the law firm Bower & Gardner as plaintiffs' counsel.[7] That motion was granted on June 1, 1992. The following August, plaintiffs filed a motion for substitution of counsel, which they withdrew several days later. On August 13, 1992, plaintiffs moved for reconsideration of the Court's order disqualifying Mr. Harmon. It appears from the record that this motion was also withdrawn.

At a status conference in October 1992, the magistrate judge established a schedule that required plaintiffs to file their second amended complaint on December 8, 1992. Canada Dry was directed to answer or otherwise respond by January 22, 1993, and the other defendants were given a deadline of February 1, 1993. Plaintiffs were then granted at least one extension of time to file the second amended complaint,[8] which they did on March 1, 1993. In accordance with a briefing schedule issued by Magistrate Judge Carter on April 14, 1993, the instant motions were filed in July 1993. Significantly, throughout this entire history, no discovery was conducted, and the defendants have not yet answered the complaint.

In February 1993, plaintiffs moved for a preliminary injunction. This was granted in April 1993, and the decision was appealed to and affirmed by the Second Circuit. *See*

*Acquaire v. Canada Dry Bottling Co. of New York,* 24 F.3d 401 (2d Cir.1994).

Thus, although almost three years passed between the filing of the initial complaint and the motion to compel arbitration, this delay cannot fairly be attributed to the defendants. There has been no answer filed and no pursuit of discovery, and the request for arbitration was not made at "the eleventh hour, with trial imminent." *Leadertex,* 67 F.3d at 26. Indeed, the volume of litigative activity in which defendants have engaged thus far falls significantly short of the level that commonly allows courts to find waiver of the right to arbitration. Further, aside from the months spent in settlement negotiations, virtually all of the lapse of time has been caused by the plaintiffs' various motions and their repeated delays in submitting amendments to the complaint.

Plaintiffs' claims that they have suffered prejudice are groundless. Their initiation of every motion (except one for attorney disqualification which set the schedule back by only a month) and every request for extension of time undercuts their contention that defendants' conduct of the litigation has subjected them to burdensome expense. Similarly without merit is the further argument that defendants should not have consented to the amended complaints, or participated in settlement negotiations, if they intended to avail themselves of arbitration. First, had the settlement negotiations been successful, arbitration would have been unnecessary. Second, a motion to compel arbitration made before the complaint was amended would have been unnecessarily time-consuming, as any newly asserted causes of action would then have to be addressed in subsequent papers. Defendants have behaved reasonably, both in attempting to settle the case and in repeatedly allowing plaintiffs to amend their complaint before taking further action. Accordingly, I conclude that their level of participation in this lawsuit cannot be held to amount to a waiver of their right to arbitration.[9]

---

**7.** Transervice was not a party to the Distributor's Agreements and thus is not among the parties seeking to compel arbitration.

**8.** Defendants allege that two extensions were granted: one through February 1993 and the other through March 1993.

**9.** As noted above, plaintiffs argue for application of New York law to their waiver argument rather

Plaintiffs place particular emphasis on defendants' opposition to plaintiffs' motion in February 1993 for a preliminary injunction. They argue that because defendants "vigorously litigated" that motion, including an appeal to the Second Circuit, they should be held to have waived arbitration. Plaintiffs fail to recognize that defendants had no choice but to respond to the motion as they did. A district court retains jurisdiction to consider an application for a preliminary injunction even if the matter has already been referred to arbitration, and in some cases, even after the arbitrator himself has refused to grant injunctive relief. *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984) (reversing district court's denial of preliminary injunction where it appeared that denial resulted from the court's belief that it had lost jurisdiction to consider the motion when it held the underlying matter arbitrable). The parties in this case would have been required to litigate the preliminary injunction motion whether or not the matter had been referred to arbitration. Therefore, plaintiffs can show no prejudice resulting from defendants' decision to do so.

Plaintiffs argue that a referral to arbitration would be unfair because it would allow defendants an alternate forum in which to litigate issues that have already been decided against them. This argument overstates the effect of the decision to grant the preliminary injunction. As noted above, the grant of injunctive relief is not a ruling on the merits, and it is not improper for an enjoined party to thereafter seek to compel arbitration of the underlying dispute.

Plaintiffs contend in addition that defendants have made statements in court that are inconsistent with an intent to arbitrate. In one instance shortly after the initial complaint had been filed, counsel for Canada Dry argued that certain of plaintiffs' claims should be litigated before the NLRB. Plaintiffs also cite Canada Dry's later consent to have Magistrate Judge Carter preside over all matters that arose in the action. (The full text of the attorney's statement is set forth in the margin.) [10]

Neither of the statements carry the underlying meaning that plaintiffs attribute to them. The context of the earlier statement reveals that it has no bearing on the issue now before the Court. On November 28, 1990, seven days after the filing of the original complaint, Canada Dry and its affiliates opposed plaintiffs' motion for a preliminary injunction. As part of this opposition, defendants contended that plaintiffs' claims *for injunctive relief* under the Taft–Hartley Act could be considered and passed upon by the NLRB only. In that context, defendants' statement cannot reasonably be construed as a waiver of their contractual right to arbitration.

Likewise, the statement before Magistrate Judge Carter did not convey the waiver of arbitration that plaintiffs impute to it.

than federal law construing the Federal Arbitration Act. However, the New York cases that plaintiffs cite, *De Sapio v. Kohlmeyer,* 35 N.Y.2d 402, 405, 321 N.E.2d 770, 772, 362 N.Y.S.2d 843, 846 (1974), and *Sherrill v. Grayco Builders, Inc.,* 64 N.Y.2d 261, 272, 475 N.E.2d 772, 775–76, 486 N.Y.S.2d 159, 162–63 (1985), are no more supportive of their position than the federal cases outlined above.

10. [MR. GREENE (counsel for Canada Dry Defendants)]: It is our position, Your Honor, that you have full jurisdiction to enter any orders whatsoever in this case including an order on the merits. . . .

[In August, 1992] there was a lengthy discussion regarding the consent that was entered into at that time . . . It also involved the scheduling for Your Honor's hearing and determining a motion to dismiss that we have been talking to Your Honor about for some time.

\* \* \* \* \* \*

So I think that it is quite clear, Your Honor, that all counsel including present counsel here today have consented to Your Honor's appearing and determining these matters.

\* \* \* \* \* \*

All schedules were imposed with the understanding that these motions would be heard before you sitting for all practical purposes as a federal judge.

THE COURT [Magistrate Judge Carter]: I think there is little doubt that counsel at a early (sic) time expressed a clear intention to consent to having this matter referred to me for all purposes.

(Transcript of Hearing, February 8, 1993 pp. 8–10.)

By making this statement, Canada Dry's counsel expressed his client's consent to have the magistrate judge rule on motions—and if necessary, enter judgment in the case—rather than merely issue recommendations to the assigned district judge.[11] Such consent is often given, and has the limited (albeit important) effect of delegating judicial tasks to magistrate judges so the wheels of justice may turn more efficiently. There is nothing in such a decision that suggests an intent to waive a right to arbitration. In any event, to give Canada Dry's statement that effect would be to transgress the well-settled principle that waiver of the right to arbitration "is not lightly to be inferred." *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir.1968). Particularly here, where defendants sought to compel arbitration before answering, such an inference would be inappropriate.

■ Finally, plaintiffs contend that defendants' failure to request arbitration within the 30–day time limit contained in Paragraph 22 amounts to waiver. The clause reads in pertinent part: "A request for arbitration must be made in writing with a copy to the other party within thirty (30) days after the facts arose which form the basis of the dispute." Plaintiffs contend that the defendants were obliged to request arbitration in writing within thirty days of the facts giving rise to the dispute. Because they did not attempt to obtain arbitration until almost three years after the action was filed, the argument goes, they forfeited their rights under Paragraph 22.

Defendants have advanced a contrary interpretation of the 30–day provision and its effect on their dispute with the plaintiffs. However, I will not resolve this issue, because the case law clearly indicates that it is properly addressed to the arbitrator, not the Court. This case is indistinguishable from *Conticommodity Services, Inc. v. Philipp & Lion*, 613 F.2d 1222 (2d Cir.1980), which held that:

> In the absence of express language in the contract referring to the court questions concerning the timeliness of a demand for arbitration, the effect of a time limitation embodied in the agreement is to be determined by the arbitrator.

*Id.* at 1227. Paragraph 22 contains no such express language. Therefore, as in *Conticommodity*, the effect of the 30–day time provision must be determined in arbitration.

In sum, I conclude that the defendants' conduct at the outset of this action was not inconsistent with their right to compel arbitration, and does not imply that they forfeited that contractual right. *See Leadertex*, 67 F.3d at 25–27.

### 4. The Continued Effect of the Arbitration Clause

■ Plaintiffs oppose arbitration on the ground that Paragraph 22 ceased to have effect on September 30, 1990, when the Distributor's Agreement expired. (Pls.' Mem. at 32–34.) They argue that although the parties' course of dealing after that date establishes that the contracts were renewed, the failure of the defendants to invoke arbitration during the subsequent three-year period requires the conclusion that Paragraph 22 had disappeared from the new contractual arrangement. Alongside this strained argument, plaintiffs contend that defendants are contradicting themselves by arguing that the Distributor's Agreement has expired but the duty to arbitrate remains in effect.

Defendants have not cast their argument in precisely these terms. Even if they had, however, the argument is not at all contradictory. Case law indicates that even after a contract has expired, an arbitration provision contained therein will generally be held to apply to subsequent disputes concerning events that occurred while the contract was still in effect. As the Second Circuit held in *Butchers, Food Handlers, etc., Local 174, etc. v. Hebrew Nat'l Kosher Foods, Inc.*, 818 F.2d 283, 287 (2d Cir.1987):

> [W]here the post-contract claim asserts that an event of an arbitrable type occurred during the term of the contract, that assertion is sufficient to warrant the court's finding the claim arbitrable *so long*

---

**11.** Indeed, it may well be true that defendants would have consented to submitting their motion to compel arbitration to the magistrate judge for decision.

*as the parties have not, by their contract, prohibited the post-contract assertion of such claims.*

(Emphasis added.)

No such prohibition appears in the Distributor's Agreement. In addition, the bulk of plaintiffs' causes of action arose from events that occurred well before September 30, 1990. Thus, the expiration of the contract has no bearing on their arbitrability.

That some of the events alleged in the Second Amended Complaint occurred after the expiration of the contract does not require a different result. The Supreme Court has held that unless an expired contract clearly indicates otherwise, a dispute over a provision thereof is arbitrable if the dispute (1) concerns events that occurred after expiration, and (2) would have been arbitrable had the events occurred before expiration. *Nolde Bros. v. Bakery & Confectionery Workers Union,* 430 U.S. 243, 252–53, 97 S.Ct. 1067, 1072–73, 51 L.Ed.2d 300 (1977); *see also Monroe Sander Corp. v. Livingston,* 377 F.2d 6, 10 (2d Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967) (arbitration clause ordinarily survives expiration of the agreement that contains it and governs any dispute that arises out of that agreement). Whether the *Nolde* rule is broad enough to cover plaintiffs' claims concerning events that occurred after 1990 has not been briefed by the parties and is not considered here.[12] However, the breadth of Paragraph 22, discussed *infra* pp. 834–837, and plaintiffs' suggestion that the parties do not agree about whether the Distributor's Agreement is still in effect, support a finding that these claims must be referred to arbitration. As the Second Circuit held in *McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 522 (2d Cir.1980):

> If the arbitration clause is broad and arguably covers disputes concerning contract termination, arbitration should be compelled and the arbitrator should decide any

claim that the arbitration agreement, because of substantive or temporal limitations, does not cover the underlying dispute.

For these reasons, the expiration of the Distributor's Agreement does not preclude this Court from granting the motion to compel arbitration.

### 5. *The Alleged Bias of the Arbitrator*

Paragraph 22 contains the following provision for selection of an arbitrator:

> [A]ny and all disputes ... shall be determined in arbitration before Harry Silverman, Esq. (or the person then acting as the replacement arbitrator for Harry Silverman, Esq. in the majority of Distributor Agreements which previously named Harry Silverman, Esq. as arbitrator, between soft drink bottling companies in New York City and Distributors) ...

At oral argument, plaintiffs claimed that Silverman is biased against them. Having been informed that Silverman retired, plaintiffs now claim that the replacement arbitrator will be biased.

Stanley Israel, one of several defendants in the action who are affiliated with Canada Dry, stated the following in an affidavit submitted on September 29, 1995 at the direction of the Court. In the fall of 1983, Silverman retired, and the procedure set forth in Paragraph 22 was employed to select his successor. At that time, the Coca–Cola Bottling Company of New York ("Coca–Cola") had "the majority of Distributor Agreements which previously named Harry Silverman, Esq. ... between soft drink bottling companies in New York City and Distributors." Accordingly, William Glinsman, Esq., the replacement arbitrator for Silverman under the Coca–Cola agreements, became the arbitrator under the Canada Dry and Coors agreements as well. Glinsman retired in July 1990, and was replaced, pur-

---

**12.** The Supreme Court expressly limited the *Nolde* holding to apply only

> where [the dispute] involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract

interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 206, 111 S.Ct. 2215, 2225, 115 L.Ed.2d 177 (1991).

suant to the same procedure, by Howard Golob, Esq., an independent arbitrator and former attorney for the National Labor Relations Board. Since then, Golob has arbitrated several disputes between Canada Dry and its distributors. Examples of his decisions are attached to the Israel affidavit.

Plaintiffs accuse defendants of failing to supply documentary evidence that Golob was in fact the person named in the majority of distributor agreements, as required by Paragraph 22. However, plaintiffs do not contest any of the facts set forth in the Israel affidavit, and have not offered documentary evidence to contradict them. For this reason, the Court is satisfied that Golob has been duly selected in accordance with the provisions of the Distributor Agreement, and should accordingly preside over the parties' arbitrable disputes.

▪ Plaintiffs also attack Golob's fitness to serve as the arbitrator, particularly with respect to the instant dispute. Specifically, they contend that because Golob was selected by Local 812 and Coca–Cola to arbitrate disputes between those two parties, he is incapable of presiding fairly over any controversy involving Local 812 or the Retirement Funds. They demand that "a neutral arbitration forum" be employed in the event this Court disagrees with their contention that the instant dispute is not arbitrable.

The legal basis for plaintiffs' challenge lies in two cases decided by district courts in this circuit: *Erving v. Virginia Squires Basketball Club,* 349 F.Supp. 716 (E.D.N.Y.), *aff'd,* 468 F.2d 1064 (2d Cir.1972), and *Cristina Blouse Corp. v. International Ladies Garment Workers' Union,* 492 F.Supp. 508 (S.D.N.Y.1980). In both cases, the court disqualified an arbitrator who was specified by name in an arbitration agreement, and directed that a neutral arbitrator be substituted. *Erving,* 349 F.Supp. at 719; *Cristina Blouse Corp.,* 492 F.Supp. at 510.

However, in both of those cases, the named arbitrator was found to have a critical conflict of interest: in *Erving,* the arbitrator was a partner in the law firm representing one of the parties to the arbitration agreement; and in *Cristina Blouse Corp.,* the arbitrator had acted as attorney for one of the parties. Plaintiffs do not allege that Golob suffers from an analogous conflict. His selection by Local 812 and Coca–Cola to arbitrate their disputes suggests a recognition by both parties of his ability to fairly resolve them. In any event, it does not indicate that he will be biased in resolving the disputes at issue here.

Plaintiffs further assert that because they are no longer members of Local 812, they are no longer subject to Golob's jurisdiction as arbitrator of their disputes with Canada Dry/Coors. This argument makes little sense. Paragraph 22 is a provision in a contract between Canada Dry (or Coors) and each of their distributors. The contract does not mention Local 812 or in any way condition compliance with its terms on membership in that union.

Finally, plaintiffs contend that the Coca–Cola contracts cannot be the basis for naming Golob the arbitrator of disputes involving Canada Dry/Coors because those contracts terminated in August 1994.[13] This argument fails because, among other reasons, the termination of the Coca–Cola contracts occurred over a year after defendants filed the instant motion.

For all these reasons, plaintiffs' challenges to the qualifications of Howard Golob and the method of selecting him are rejected.

**B.** *The Scope of the Arbitration Agreement*

▪ The next part of the consideration of arbitrability concerns whether plaintiffs' claims fit within the terms of the arbitration clause. As stated above, federal policy strongly favors arbitration. The Supreme Court has stated:

[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or like defense to arbitrability.

---

13. Termination occurred when distributors of Coca–Cola products agreed to accept the compa-

ny's offer to buy back their distributorships for a total of $140 million.

*Moses H. Cone Memorial Hospital,* 460 U.S. at 24–25, 103 S.Ct. at 941; *see also AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (the presence of an arbitration clause creates a presumption of arbitrability). In conformity with these principles, the Second Circuit has acknowledged that it is required "to construe arbitration clauses as broadly as possible." *S.A. Mineracao da Trindade–Samitri v. Utah International, Inc.,* 745 F.2d 190, 194 (2d Cir.1984). Accordingly, a request for arbitration will be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the 'asserted dispute.'" *AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)).

▮ The presumption in favor of arbitration is particularly applicable when the arbitration clause is broadly worded. *AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419; *see also Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 121 (2d Cir. 1991) (a broadly worded arbitration clause creates "the strong presumption in favor of arbitrability applies with even greater force"). Such circumstances call for arbitration of any grievance that is not expressly excluded by the arbitration clause, unless there exists "'the most forceful evidence of a purpose to exclude the claim from arbitration.'" *AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Warrior & Gulf,* 363 U.S. at 585, 80 S.Ct. at 1354); *see also Roso–Lino Beverage Distributors,* 749 F.2d at 126 (when presented with "a broad arbitration clause, providing for only a narrow exception, a court should compel arbitration unless there is positive, unambiguous assurance that the dispute is within that narrow exception"); *Wire Service Guild, etc. v. United Press International, Inc.,* 623 F.2d 257, 260 (2d Cir.1980) (language excepting certain disputes from arbitration clause must be "clear and unambiguous" or "unmistakably clear").

▮ Paragraph 22, with its provision that disputes "concerning the interpretation or application of" the Distributor's Agreement, is such a broadly-worded provision. Plaintiffs contend that it could have been worded even more broadly to cover, for example, "any controversy which might arise between the parties." The decision to employ the "interpretation or application" terminology, plaintiffs argue, demonstrated an intent to "narrowly circumscribe" the arbitration clause.

Plaintiffs' position is at odds with the case law. The example they provide is admittedly the most sweeping language imaginable and has been described as such. *See Truck Drivers Local Union No. 807, I.B.T. v. Regional Import & Export Trucking Co.,* 944 F.2d 1037, 1043 (2d Cir.1991) ("We are hard-pressed to think of a more sweeping arbitration clause"). Nevertheless, language similar to that used in Paragraph 22 is also regularly deemed broad. *See, e.g., AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419 (clause providing for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder" is broad enough to render application of the presumption in favor of arbitration "particularly applicable"); *Wire Service Guild,* 623 F.2d at 260 (provision requiring arbitration of "any grievance as to the interpretation or application of this Agreement" is "broadly phrased"); *Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co.,* 298 F.2d 644, 645 (2d Cir.1962) (provision requiring arbitration of disputes "having to do with the interpretation or application of any provision of this agreement" is "broad and comprehensive"); *Eastern Cleaning Service, Inc. v. Service Employees International Union, Local No. 200,* No. 79 Civ. 554, 555, 1980 WL 2059, at *5 (S.D.N.Y. January 31, 1980) (clause requiring arbitration of "disputes or grievances concerning the interpretation and application of the agreement" provides "broadest possible scope of arbitrability" and should be construed "as an all-embracing and comprehensive arbitration provision"); *Meadows Indem. Co. v. Baccala & Shoop Ins. Services, Inc.,* 760 F.Supp. 1036, 1045 (E.D.N.Y.1991) (finding provision for arbitration of "any dispute ... with reference to the interpretation of this contract or the rights of either party

with respect to any transaction under this contract" *broader* than clause requiring arbitration of "any dispute arising out of" the contract).

Plaintiffs also rely on two provisions in the Distributor's Agreement that set forth narrowly defined subjects lying outside the reach of the arbitration clause. These, they argue, weaken the conclusion that the clause is broadly formulated. The first such provision, set forth in Paragraph 6 of the Agreement, obliges distributors to maintain a delivery truck leased from, and insured and maintained by, companies approved by Canada Dry/Coors. If a distributor fails to conform with these requirements and does not correct its default within three business days after receiving notice from Canada Dry/Coors, the latter is free to terminate the distributorship. This termination decision "shall be final and shall not be subject to arbitration as to reasonableness."

The second provision relied on by plaintiffs is paragraph 18(i), which allows Canada Dry to terminate its relationship with a distributor whenever a "key employee" of the distributor ceases to work for it. Again, such termination "shall be final and binding upon the parties and shall not be subject to arbitration as to reasonableness."

These two provisions do not significantly narrow the scope of Paragraph 22, as plaintiffs attempt to argue. Under both, the only disputes expressly excepted from arbitration concern termination of the distributor relationship by Canada Dry/Coors. The plethora of authority limiting such exceptions to their express terms requires the conclusion that both apply only to the designated types of termination, neither of which is specifically alleged in the 260–page complaint. In any event, arbitration clauses with larger exceptions than those set forth in Paragraphs 6 and 18(i) have nevertheless been ruled broad enough to mandate arbitration. *See, e.g., Roso–Lino Beverage Distributors,* 749 F.2d at 126 (finding soft drink distributorship arbitration clause broad, notwithstanding exception for disputes in relation to "revision of prices and deposit requirements or to Distributor's markup"); *Wire Service Guild,* 623 F.2d at 260 (finding labor arbitration clause

"broadly phrased" despite exception for "any issue bearing on the Employer's sole responsibility to determine the size and composition of its staff").

Once it is determined that the arbitration provision in question is broadly worded, the next question is whether the claims presented fit within its scope. In this case, the question is whether plaintiffs' claims against Canada Dry, Coors and their affiliates concern "the interpretation or application of the provisions" of the Distributor's Agreement. It is clear that they do.

In making this determination, a court must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco,* 815 F.2d at 846. If the allegations "touch matters" covered by the agreement in question, then claims based on those allegations must be arbitrated. *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625 n. 13, 105 S.Ct. 3346, 3353 n. 13, 87 L.Ed.2d 444 (1985)).

All of the allegations that form the basis of the claims against Canada Dry, Coors and their affiliated co-defendants touch matters covered by the Distributor's Agreement. Plaintiffs' antitrust claims are founded upon allegations that (1) Canada Dry/Coors fixed resale prices of their products, even though the Distributor's Agreement only permitted them to "suggest" such prices; (2) the defendants engaged in illegal tying by requiring plaintiffs to lease trucks and purchase liability insurance from several providers (also named as defendants in this action), an assertion that involves the contractual provision that such duties would be performed by providers of whom the defendants approved; (3) the defendants engaged in activity designed to achieve monopoly power in the soft drink and mixer market by fixing prices, imposing tying arrangements on plaintiffs, encroaching on the exclusive territories that had been granted to plaintiffs by contract, pursuing discriminatory pricing policies in favor of "bootleggers" selling unlawfully in plaintiffs' territories, and attempting to reclaim without consideration the distribution franchises to which plaintiffs were contractually entitled; (4) the defendants were involved in a continu-

ing scheme to employ the above-enumerated means to obtain plaintiffs' franchises; and (5) defendants Honickman, Berberich and Goldstein sat on the boards of companies that were in competition with Canada Dry/Coors, thereby facilitating the anticompetitive conduct described above. The RICO claims are founded on allegations that (1) defendants required plaintiffs to lease their trucks and obtain insurance from certain companies, to join Local 812 against their will, and to set prices at a certain level; and (2) defendants employed fraudulent means—amounting to mail fraud and wire fraud—to get plaintiffs to sign the Distributor's Agreements. In addition, plaintiffs allege that: (1) defendants violated the Lanham Act by breaching the exclusive territorial licenses conferred by the Distributor's Agreement conferred on the plaintiffs; (2) defendants violated ERISA by converting contributions that were owing to the Local 812 health and pension funds as a result of plaintiffs' union membership; (3) defendants breached the Distributor's Agreement; (4) defendants defrauded plaintiffs in obtaining their signatures on the agreements, and in connection with the procurement of insurance and payment of premiums; (5) plaintiffs are entitled to a constructive trust as a result of defendants wrongful acquisition of plaintiffs' franchises to which plaintiffs were contractually entitled; and (6) defendants defamed and disparaged plaintiffs by obtaining information about the prices plaintiffs charged their retail customers and by informing those customers when plaintiffs charged prices higher than those set by defendants. All of these allegations "touch matters" covered by the Distributor's Agreement and thus are within the scope of the arbitration provision.

The final question is whether any federal statutory claims asserted in this action were intended by Congress to be nonarbitrable. *Genesco,* 815 F.2d at 844. Research has not revealed such a limitation with respect to any of them. Although antitrust claims were consistently held nonarbitrable in the past, *see, e.g., American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821 (2d Cir.1968), the Supreme Court's holding in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346,

87 L.Ed.2d 444 (1985), has caused courts to question whether the *American Safety* holding is still viable. In *Mitsubishi,* the Court held that parties to international commercial transactions could agree to arbitrate disputes arising out of their agreements, even if such claims asserted antitrust violations. *Id.* at 636, 105 S.Ct. at 3358. While it declined to assess the arbitrability of domestic antitrust disputes, the Court nevertheless cast considerable doubt on the *American Safety* doctrine in general. It did so by first confessing "some skepticism of certain aspects" of the decision, *id.* at 632, 105 S.Ct. at 3356, and then undercutting each of four grounds on which it rested. *Id.* at 632–37, 105 S.Ct. at 3356–59. Significantly, the reasoning applied by the Court in its criticism of *American Safety* is as relevant to arbitration agreements of national scope as it is to agreements between international partners.

■ Since the *Mitsubishi* decision was issued, a number of district courts in this circuit have held that domestic antitrust disputes are arbitrable. *See, e.g., Syscomm Int'l Corp. v. Synoptics Communications,* 856 F.Supp. 135, 139 (E.D.N.Y.1994) ("While *American Safety* has not been explicitly overruled, this Court believes that … domestic antitrust claims are arbitrable"); *Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 757 F.Supp. 283, 286 (S.D.N.Y.) ("[T]he reasoning of *Mitsubishi* should apply with equal force to domestic claims"), *aff'd,* 946 F.2d 883 (2d Cir.1991); *Gemco Latinoamerica, Inc. v. Seiko Time Corp.,* 671 F.Supp. 972, 980 (S.D.N.Y.1987) (claims brought under the Sherman and Robinson–Patman Acts found to be arbitrable). I find no reason to conclude otherwise with respect to the instant antitrust claims.

■ The other federal statutory claims may be addressed more summarily. Also referable to arbitration are claims brought under the RICO statutes, *Shearson/American Express v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), and ERISA claims. *Bird v. Shearson Lehman/American Express,* 926 F.2d 116 (2d Cir.), *cert. denied,* 501 U.S. 1251, 111 S.Ct. 2891, 115 L.Ed.2d 1056 (1991). While the

law regarding the arbitrability of claims under the Lanham Act and the Taft–Hartley Act is less explicit, courts have nevertheless upheld arbitration awards rendered under both statutes. *See Drake Bakeries Inc. v. American Bakery & Confectionery Workers International*, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962) (Taft–Hartley); *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (Taft–Hartley); *Blue Bell Inc. v. Western Glove Works, Ltd.*, 816 F.Supp. 236 (S.D.N.Y.1993) (Lanham). For these reasons, I conclude that plaintiffs claims against Canada Dry, Coors and their affiliated co-defendants are arbitrable.

### C. *The Remainder of the Action*

Having determined that the claims raised against those defendants who are parties to the Distributor's Agreement must be referred to arbitration, I must now consider whether to stay proceedings as to the remaining claims. *Genesco*, 815 F.2d at 844.

▮ The decision whether to stay nonarbitrable claims pending arbitration is largely within the discretion of the trial court. *See Moses H. Cone*, 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23. Imposition of a stay is "particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco*, 815 F.2d at 856.

▮ Here plaintiffs have asserted claims not only against the soft drink bottlers and manufacturers who are parties to the Distributor's Agreements, but also against myriad entities and individuals who plaintiffs allege participated in and benefitted from the alleged price-fixing, tying, monopolization and coercive activity. The claims against these additional defendants are peripheral to, and grow out of, those against the Canada Dry/Coors defendants. Most will be resolved with reference to the latter claims, and many will lose their foundation if the

claims against Canada Dry and Coors are found to be without merit. For example, plaintiffs claim that Cadbury conspired with Canada Dry and Coors to fix prices, that Local 812 participated in the efforts of Canada Dry/Coors to force plaintiffs to join the union against their will, and that Northbrook and other defendants from the insurance industry participated in the tying conspiracy and RICO violations. All of these derivative claims are likely to be dismissed if the claims against Canada Dry/Coors fail.[14]

It is likely that arbitration of plaintiffs' claims against defendants Canada Dry, Coors and their affiliates will partially determine most of the issues raised against the other named defendants in this case. It appears at the very least that significant insight will be afforded the Court and the parties by the conduct and result of the arbitration, and that this insight will prove valuable in resolving the remaining claims. A stay of all the remaining claims, then, "would promote judicial economy, avoidance of confusion and possible inconsistent results and would not work undue hardship or prejudice" against plaintiffs. *Meadows Indem. Co. v. Baccala & Shoop Ins. Services Inc.*, 760 F.Supp. 1036, 1045 (E.D.N.Y.1991).

## II. *The Contempt Motion*

### A. *The Preliminary Injunction*

Canada Dry pays its distributors a commission for each case of soft drink that they deliver to retailers. This payment is made at the end of the workday, when the distributors return to the Canada Dry warehouse with the cases of product that they did not sell during the day and with payment for the cases they did sell. They retain the portion of the payment that constitutes their commissions and remit the balance to Canada Dry.[15]

Periodically, Canada Dry offers promotional discounts. It makes these discounts available by reducing the suggested wholesale

---

14. Plaintiffs have raised some claims that are only distantly related to the arbitrable ones. Claims of negligence and fraud asserted against the defendant insurance companies, and of malpractice against the insurance broker, are some examples. However, these are few in number.

15. The distributors are allowed to charge any price they wish to the retailers. If they choose to charge a price higher than Canada Dry's suggested retail price, they keep the commission plus the difference between the sale price and the suggested price.

price of the promoted product. Although this arrangement reduces the amount of money Canada Dry receives for the promoted product, it does not affect the commission the distributors receive when they sell those products to retailers.

Distributors are free to elect between selling the promoted products under the normal arrangements or participating in the promotional programs. If they choose the latter option, however, they are expected to pass the price reductions on to retailers by selling the promoted products for no more than the discount retail prices.

Prior to April 1993, Canada Dry enforced its discount pricing policy by requiring participating distributors to submit a pre-printed invoice signed by each retailer who purchased the promoted product at the discounted retail price.[16] Distributors who purchased product at the discounted price but failed to pass the discounts along to retailers were required to refund to Canada Dry the amount of the promotional discount. Canada Dry informed the distributors that it retained the right not to load the trucks of those who failed to pay such refunds.

Canada Dry first enforced this "no-load" policy against 15 distributors on February 3, 1993. The following day, plaintiffs moved for a temporary restraining order and preliminary injunction. They requested that Canada Dry be enjoined from using various means to force its distributors to charge the suggested resale prices. A temporary restraining order was issued and the preliminary injunction motion was referred to Magistrate Judge Zachary W. Carter, who issued a Report and Recommendation on March 5, 1993. The Honorable Sterling Johnson adopted Judge Carter's Report and Recommendation on April 12, 1993. Judge Johnson's order reads as follows:

> ... it is hereby
>
> ORDERED that Plaintiffs' motion for an order enjoining defendant from refusing to release plaintiffs' loaded trucks or otherwise withholding product from plaintiff distributors is GRANTED; and

Plaintiffs' motion for an order enjoining defendants from engaging in other conduct designed to enforce compliance with defendant's promotional discount policies, including defendant's policy requiring customer signatures on preprinted invoices is DENIED.

> IT IS FURTHER ORDERED that upon a particularized showing by defendant that it cannot adequately protect itself against the loss of promotional monies expended through the use of accounting adjustment or other means, that plaintiff distributors be required to post a bond adequate to secure the repayment to defendant of promotional discount monies provided by defendant but not passed on to retailers by plaintiff distributors.

Order dated April 12, 1993 at 6–7. On May 13, 1994, the Second Circuit affirmed the issuance of the injunction. *Acquaire v. Canada Dry Bottling Co. of New York, Inc.*, 24 F.3d 401 (2d Cir.1994).

### B. *The Tax Withholding Issue*

Meanwhile, Canada Dry came into conflict with the Internal Revenue Service ("IRS"). In 1991, the IRS, apparently alerted by this litigation, began a tax audit of Canada Dry. In late 1994, it concluded that the distributors are employees of Canada Dry for federal employment tax purposes. Shortly thereafter, Canada Dry reached a settlement with the IRS, pursuant to which Canada Dry agreed that beginning May 1, 1995, it would withhold employment taxes from the distributors and pay payroll taxes that the distributors had originally been required to pay. On April 24, 1995, Canada Dry notified its distributors that, beginning May 1, it would reduce distributor commissions to cover the amounts to be withheld.

Many of the distributors did not accept this arrangement, and refused to refund amounts sufficient to cover the withholding. On May 3, 1995, Canada Dry responded by withholding soft drink products from those distributors. On the same day, plaintiffs

---

**16.** These invoices set forth not only the discount prices applicable to the promotion, but also the suggested wholesale prices of all Canada Dry products. Thus, the invoices effectively informed retailers of the distributors' profit margins.

moved that Canada Dry be held in contempt of the April 12, 1993 injunction for withholding product from distributors who refused to accept the reductions in their commissions to cover the new taxes. The Court restrained Canada Dry from withholding product for this reason pending the resolution of the contempt motion. The motion was held in abeyance at the parties' request pending settlement discussions. Those discussions apparently failed, and the motion is ripe for resolution.

### C. Discussion

■ The April 12, 1993 injunction is broadly worded. Read literally, it prohibits Canada Dry "from refusing to release plaintiffs' loaded trucks or otherwise withholding product" for *any* reason. Thus, even if plaintiffs refused to remit any money to Canada Dry at all, the terms of the order could nevertheless be read to require Canada Dry to continue to supply the soft drinks.

Of course, Judge Johnson issued the preliminary injunction against a backdrop of litigation over Canada Dry's enforcement of promotional discounts. That backdrop provides insight concerning when and under what circumstances the order should be enforced. "[A]n overly broad decree whose terms are divorced from the relief sought may be as ambiguous as a vague decree," and thus it is sometimes necessary to construe the injunction consistently with the plaintiff's complaint and the relief to which he was found to be entitled. *New York Tel. Co. v. Communications Workers of America,* 445 F.2d 39, 48 (2d Cir.1971). *See also Haskell v. Kansas Natural Gas Co.,* 224 U.S. 217, 223, 32 S.Ct. 442, 444, 56 L.Ed. 738 (1912) ("the decree must be read in view of the issues made and the relief sought and granted").

The primary concern underlying the injunction was that Canada Dry's withholding of product "could readily be exploited as a pretext for enforcing resale price maintenance" and should not be used "as a means of enforcing ... promotional discount policies." *Acquaire v. Canada Dry,* No. 90–CV–4005 at 20, 1993 WL 741551 (E.D.N.Y. March 8, 1993) (report and recommendation); *see*

*also Acquaire,* 24 F.3d at 412 (noting support for Judge Johnson's conclusion "that the withholding of product and impounding of trucks might be used by Canada Dry to enforce resale price maintenance rather than merely to police its promotional program").

The withholding of product from distributors who refuse to remit amounts sufficient to cover Canada Dry's federal tax obligations has nothing to do with enforcing resale price maintenance, and, I conclude, is not prohibited by the order. For this reason, plaintiffs' motion to have Canada Dry held in contempt is denied.

### ORDER

For the reasons stated above, the motion to compel arbitration is granted. The parties to the Distributor's Agreements are directed to submit this multi-faceted dispute to arbitration pursuant to Paragraph 22 of that contract. The motion dated May 3, 1995, to have Canada Dry held in contempt is denied, and the temporary restraining order dated May 3, 1995 is vacated. All other claims and all other pending motions are hereby stayed pending the outcome of the arbitration.

So Ordered.